```
         IN THE UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF MISSOURI
                      WESTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
           Plaintiff,          )
                               )
    v.                         )   Criminal Action No.
                               )   12-00374-01-CR-W-HFS
QUINCY JACKSON,                )
                               )
           Defendant.          )
```

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Before the court is defendant's motion to suppress evidence on the grounds that (1) the warrant was not supported by probable cause, (2) the search warrant was based on misleading information in the affidavit that the affiant knew or should have known was false, (3) the affidavit included information gathered as a result of an illegal seizure of defendant's person, and (4) the affidavit omitted critical information regarding the canine's reliability. In his suggestions in support, defendant fails to elaborate on his arguments that the search warrant was based on false or misleading information or that the affidavit omitted critical information regarding the canine's reliability. However, after reviewing all of the arguments presented and all of the evidence adduced at the suppression hearing, I find that the search warrant was supported by probable cause and that defendant's rights were not violated as alleged in his motion. Therefore, his motion to suppress should be denied.

*I.  BACKGROUND*

On November 27, 2012, defendant landed his airplane at the Charles Wheeler downtown airport and subsequently went to the

Argosy hotel for the night.  Officers brought a dog trained to detect illegal drugs to the airport, and the dog alerted positively to the aircraft.  Officers went to the Argosy hotel and attempted to contact defendant but he refused to come to the door of his hotel room.  The following morning an affidavit for a search warrant was prepared.  Before the judge signed the warrant, defendant came out of his hotel room and saw officers who had been waiting in a nearby stairwell.  He ran back to his hotel room, chased by the officers.  Defendant was detained pending the drug investigation.  Later that day, a federal search warrant was issued and agents recovered marijuana from defendant's aircraft.

On December 12, 2012, an indictment was returned charging defendant with one count of possession of a controlled substance with intent to distribute on board an aircraft, in violation of 21 U.S.C. §§ 959(b)(2) and 960, and one count of possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D).  Thirteen months later, on December 20, 2013, defendant filed the instant motion to suppress.  On January 27, 2014, the government filed a response in opposition.  I held a hearing on February 26, 2014.  Defendant was present, represented by K. Louis Caskey and Stephanie Burton.  The United States was represented by Assistant United States Attorney Rudolph Rhodes, IV.  The following witnesses testified:

    1.    Special Agent Robert Taylor, Drug Enforcement Administration

2.  Sergeant Charles Jones, KCI Airport Police

3.  DEA Task Force Officer Christopher Scott, Missouri State Highway Patrol.

The following exhibits were admitted:

P. Ex. 1   Certification of Ezee, a dog who had been trained in drug detection

P. Ex. 2   Affidavit, warrant and return for the search of defendant's aircraft

P. Ex. 3   Photo of defendant's aircraft, a 1963 Piper Cherokee

P. Ex. 4   Photo of a Magnum box containing marijuana, seized from the aircraft

P. Ex. 5   Photo of a Magnum box containing marijuana, seized from the aircraft

P. Ex. 6   Photo of two boxes containing marijuana after they were removed from the aircraft and are sitting on the right wing

P. Ex. 7   Photo of Home Depot box containing marijuana, seized from the aircraft

P. Ex. 8   Photo of bags of marijuana after having been removed from the boxes

P. Ex. 9   Photo of marijuana after having been removed from the boxes

P. Ex. 10  Air worthiness certificate and aircraft registration for defendant's aircraft

## II. FINDINGS OF FACT

1.  On November 27, 2012, a duty agent for Homeland Security got a report from the U.S. Customs and Border Protection Air Marine Operations Center ("AMOC") that there was a small aircraft that had diverted on its flight plan -- it was originally going to Illinois and it launched out of Wichita and

then diverted to the Wheeler Airport (also known as the downtown airport) in Kansas City for the evening (Tr. at 3-4). Initially the Homeland Security agent contacted the Kansas City Airport Police, and Sergeant Charles Jones brought his K-9 to the airport (Tr. at 4, 28). The aircraft was sitting in front of the General Aviation Facility (Tr. at 5, 19). The dog, Ezee, was trained to detect marijuana, methamphetamine, cocaine, heroin and Ecstasy, and she had a 97% success rate during training and a 100% success rate while working in the field (Tr. at 51-52, 63-64, 74, 75). During the year that Sergeant Jones worked with Ezee, she never alerted falsely (Tr. at 70, 75). At about 9:30 p.m. Ezee alerted positively to an odor of narcotics around the area of a vent in front of the left wing of the aircraft (Tr. at 5, 19, 53-55). She then alerted to the opposite side of the aircraft (Tr. at 55). The DEA was notified (Tr. at 5).

2. At about 10:00 p.m. that evening, DEA agents learned that the pilot of the aircraft, defendant Quincy Jackson, had landed and refueled the plane, and then he had been taken to the Argosy Casino and Hotel in nearby Riverside (Tr. at 6, 16). The agents got to the airport at about 10:45 p.m. (Tr. at 17). They went to the Argosy a little before midnight and talked to the management to find out what room defendant was in -- their intent was to talk to him and see if he would consent to a search of the aircraft (Tr. at 6, 23, 29).

3. Special Agent Taylor and three task force officers went to the hotel room (room number 312) and knocked on the door (Tr.

4

at 6-7, 30). There was no response (Tr. at 7). One of the agents went to the house phone in the hallway and called room 312, and defendant answered the phone (Tr. at 7). The agent identified himself as a law enforcement agent and said he would like to talk to defendant, and defendant said he would come to the door (Tr. at 7). The agents waited at the hotel room door, but no one came to the door (Tr. at 7). They called defendant's cell phone number and also called the hotel room again, but defendant did not answer either phone (Tr. at 7). The agents heard the television from inside the room getting very loud, and they began to smell a strong odor of Swisher Sweet cigars (Tr. at 7-8). The agents knew that people commonly load Swisher Sweet cigars with marijuana, so they brought a different drug dog to the hotel but the dog did not alert in the area of defendant's hotel room door or anywhere else (Tr. at 8, 30).

 4. At that point, the agents concluded they would need to get a search warrant for the aircraft (Tr. at 8). At approximately 2:00 a.m. the following morning (November 28, 2012), Special Agent Taylor went back to the airport to draft an affidavit and to keep an eye on the aircraft (Tr. at 8-9, 23, 30). He also talked to AMOC again who indicated that defendant had had his pilot's license for less than a month and had purchased his aircraft before he got his license, which was suspicious to AMOC when coupled with the facts that he was making a long-range flight in an aircraft that is not commonly used for long-range travel and he had deviated from his flight plan (Tr.

at 9, 25). At approximately 8:00 a.m. Special Agent Taylor submitted his search warrant affidavit to the prosecutor's office electronically (Tr. at 9-10). The prosecutor requested an amendment of the affidavit to include the drug dog's certification (Tr. at 33).

    5.    When Special Agent Taylor left the Argosy, there were four to five law enforcement officers who remained at the hotel (Tr. at 30). Task Force Officer Christopher Scott went to the Argosy at about 7:30 a.m. on November 28, 2012 (Tr. at 77). He met with other officers who gave him the information about the aircraft and defendant being in a room at the hotel (Tr. at 78). At approximately 8:00 a.m., Officer Taylor went up to the third floor of the hotel, and he and Officer Grittman waited in the stairwell on the east side of defendant's room (Tr. at 78, 87). After a short time, the hotel room door opened but no one came out right away (Tr. at 78-79, 86). Then defendant stuck his head out of the door and looked both ways down the hallway, but he still did not come out of the room (Tr. at 79). After a couple of seconds, he casually walked out of the room (Tr. at 79). As the hotel room door began to close behind him, Officers Grittman and Scott identified themselves as police (Tr. at 79). Defendant turned around and ran back into the room (Tr. at 79). The officers followed defendant through the door (Tr. at 79). Defendant ran toward the window of the hotel room, and Officer Grittman followed him and handcuffed him (Tr. at 79).

6. Officer Grittman read defendant his <u>Miranda</u> rights (Tr. at 79, 87). Defendant said he was on the phone with his lawyer and did not want to talk to the officers (Tr. at 79). Defendant said he did not know for sure whether the officers were the police or whether he was being robbed (Tr. at 80). The officers stayed in the room with defendant for about an hour -- defendant did not make any statements during that time (Tr. at 80, 81). He was asked for consent to search his luggage, but he refused so the luggage was not searched (Tr. at 82, 83).

7. During that day while the agents were waiting for the search warrant to be issued, law enforcement officers stayed with defendant who had been detained pending the drug investigation (Tr. at 47). Defendant had previously ordered breakfast, and that arrived while he was in the hotel room waiting with the officers and defendant ate it (Tr. at 87-88). The hotel room was only searched after defendant checked out (Tr. at 40, 43, 44, 82, 83). Defendant took everything from the room that belonged to him, and the officers only searched the trash (Tr. at 84). Nothing of evidentiary value was found (Tr. at 40, 43, 44, 85). Check-out time was 11:30 a.m. (Tr. at 85).

8. Defendant was driven to the Wheeler airport (Tr. at 80, 83). While at the airport, Officer Scott sat with defendant and they watched the news while the law enforcement officers were waiting for a search warrant to be issued (Tr. at 81).

9. The search warrant was signed by United States Magistrate Judge Sarah Hays at approximately 5:40 p.m. (Tr. at

9-12; P. Ex. 2). Earlier that day she had questioned the prosecutor about the fact that medicinal marijuana is legal in California, and the prosecutor provided case law indicating that despite the legality of medicinal marijuana in California it is still a violation of federal law (Tr. at 37-39). The agents then searched the aircraft and recovered two large boxes in the cargo section of the plane that contained 39 bags of marijuana weighing a total of 15.7 kilograms (Tr. at 12).

    10. The only information that was not included in the affidavit was the following: defendant was detained at his hotel room, after he checked out of room 312 it was searched but officers found no evidence, and when the officers questioned defendant he made a general denial and requested an attorney (Tr. at 40, 43, 44, 45). This information was not included in the affidavit because the affidavit has been submitted by Special Agent Taylor before this occurred (Tr. at 45). Special Agent Taylor did not present any information to Judge Hays orally when he went to swear to the affidavit -- he did not talk to her about anything that had occurred at the Argosy (Tr. at 46).

    11. Defendant never made any incriminating statement, and there is no statement by defendant that the government intends to use at trial (Tr. at 53, 90).

### III. WARRANTLESS SEIZURE OF DEFENDANT AT THE HOTEL

Defendant first argues that he was

> unlawfully seized . . . in that he was detained beginning on November 28, 2012 at midnight when the officers approached his hotel room and he was not free to leave. Evidence that

the defendant was not free to leave is based upon the fact
[that] when the defendant refused to speak . . . with the
officers, the five officers set up surveillance until the
defendant attempted to leave at approximately 8:09 am.  When
the defendant retreated to his room, the officers followed
him into the room and detained him.

Defendant argues that there was no probable cause to arrest him in the morning because the drug dog did not alert to the presence of any odor of illegal drugs at defendant's hotel room door, and "at that point the inquiry of whether he was conducting illegal activity in his hotel room should have ended."  In addition defendant points out that the Hangar employees suggested that defendant intended to return to the aircraft the next day, so any further questioning on that issue "could have been made upon the defendant's return to the aircraft, rather than secluding the defendant in his room because he refused to acknowledge their request for questioning."

Because the undisputed evidence is that nothing was seized from defendant as a result of his detention, and he made no incriminating statements, the issue of defendant's arrest is immaterial -- there is nothing to be suppressed as a result of that arrest, and indeed defendant does not identify in his motion anything that he believes should be suppressed as a result of his detention.  Because there is no relief to be granted, I decline to address this issue.

### IV. *PROBABLE CAUSE SUPPORTING SEARCH WARRANT*

Defendant next argues that the warrant to search the aircraft was not valid.

The warrant that was issued was done so without probable cause or was otherwise defective in form.

 a. In particular, the search warrant signed on November 27, 2012 [sic] was issued based on misleading information in the affidavit that the affiant knows or should know is false.

 b. The affidavit included information gathered as a result of a seizure of the defendant that the affiant knew or should have known was illegal.

 c. The affidavit included with the application for search warrant omits critical information regarding the canine's reliability.

**A. *PROBABLE CAUSE FINDING***

Defendant argues that the affidavit in support of the search warrant is lacking in probable cause. The affidavit is seven pages long and recounts Special Agent Taylor's law enforcement experience and training. It describes his years of drug investigations involving aircraft used to transport illegal drugs. It describes a class he attended not long before the incident at issue in this case on domestic aircraft interdiction provided by the United States Customs and Border Protection, Air Marine Operations Center. It describes the training of the drug dog Ezee; Ezee's certification in detecting marijuana, methamphetamine, cocaine and heroin; and Ezee's 97% accuracy rate in training environments. It describes how Ezee alerted positively to the presence of an illegal drug odor in the vicinity of a vent in the lower left cowling just above the left wing of defendant's airplane. It describes how officers were able to see two boxes inside the airplane. It describes how and when defendant arrived at the airport and talked airport

employees into giving him a ride to the Argosy Casino and Hotel, and says that defendant planned to resume his flight to Jacksonville, Illinois.

It describes, just as outlined in the Findings of Fact above, how law enforcement agents went to the hotel and called defendant's room, identifying themselves as law enforcement officers. It says defendant agreed to come to the door but did not come to the door or answer any further calls from law enforcement. It describes how the television became loud in defendant's room, and it describes running a drug dog by defendant's hotel room door and getting no positive response from the dog.

It includes information from the AMOC Law Enforcement Division relaying experience in interdiction of non-commercial aircraft used to transport illegal drugs:

> SSA Weidhase is a recognized expert in the investigation and interdiction of non-commercial aircraft used to facilitate criminal enterprises, including the domestic transportation of narcotics and unlawful proceeds. SSA Weidhase told me that the route and manner of flight by themselves were not deemed suspicious; however N1000P [the aircraft] was registered by JACKSON on June 8, 2012 and JACKSON received his initial private pilots' license on October 30, 2012. SSA Weidhase told me that AMOC routinely takes an interest in non-commercial aircraft that travel long distances, especially when the travel occurs at night, over long distances, involves newly rated pilots with no commercial motivation, involves pilots with a criminal history, and/or recently registered aircraft. SSA Weidhase further explained that while none of the above represents an indicator of criminal activity, such activities are often the basis for additional investigation and, in this instance, represented an opportunity for a lawful canine search to provide additional information.

(Search warrant affidavit at pages 6-7).

11

The main basis for the probable cause in the affidavit is the positive alert by the drug dog Ezee. In Florida v. Harris, 133 S. Ct. 1050 (2013), the Supreme Court discussed the framework courts should use to determine whether a drug dog sniff is reliable enough to give police officers probable cause to conduct a search. The appropriate inquiry is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test." Id. at 1058. The Supreme Court said more emphasis should be placed on a dog's performance in controlled settings than its performance "in the field." 133 S. Ct. at 1056. In this case, Ezee's performance in controlled settings, i.e. training, was 97%.

The facts of this case are very similar to those in United States v. Holleman, --- F.3d ---, 2014 WL 747606 (8th Cir., February 27, 2014). There, a Highway Patrolman pulled Holleman over for exceeding the 70-mile-per-hour speed limit by three miles per hour and for following too closely behind another car. He intended to give Holleman a warning ticket. Holleman refused to roll his window down more than an inch which aroused the suspicions of the trooper who let his drug dog walk around Holleman's truck. The dog got distracted by a dead animal in the ditch, so the trooper permitted Holleman to go on his way. However, he provided this information to the DEA who then observed Holleman pull his truck into a hotel parking lot. A DEA

12

agent brought a drug dog to the parking lot and allowed the dog to sniff search several vehicles. The dog alerted positively to Holleman's truck, so the agent applied for a search warrant. While the agents were waiting for issuance of the search warrant Holleman sat with the agents in the parking lot and when an agent tried to engage him in casual conversation, he indicated he wanted a lawyer. When the search warrant was executed, agents found marijuana in Holleman's truck. He moved to suppress the marijuana, arguing that the drug dog's alert was insufficient to establish probable cause for the warrant.

The Eighth Circuit noted that the Supreme Court, in <u>Florida v. Harris</u>, supra, said "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." <u>Id</u>. at 1057. In <u>Holleman</u> the drug dog's in-field accuracy rate was 57%, and the court of appeals found that sufficient because the dog had completed certified training. The court also noted that an even lower in-field rate of 54% had been found sufficient to support a finding of probable cause in <u>United States v. Donnelly</u>, 475 F.3d 946 (8th Cir. 2007). In this case, the drug dog involved had an in-field accuracy rate of 100% and had just recently completed certified training with a 97% accuracy rating, clearly sufficient to establish probable cause.

In addition to the positive drug dog alert, the court in <u>Holleman</u> noted other factors that created a "totality of facts" supporting a probable cause finding:

>(1) Defendant failed to open the passenger side window more than one inch when Trooper Clyde first approached Defendant's truck; (2) Defendant provided a hesitant answer regarding where he was going; (3) Defendant had a Washington state license plate and stated that he was driving the arc welders in his truck to Washington D.C. but curiously stated that he was dropping off only one of the two arc welders in D.C. and that the other arc welder belonged to him; (4) Defendant's stated occupation -- video producer -- was inconsistent with the arc welders; and (5) Trooper Clyde believed that Defendant was displaying nervous energy and was breathing heavily.

Similarly, in this case, Special Agent Weidhase indicated that in his experience, further investigation is justified when a fairly new pilot of a non-commercial aircraft travels a long distance and deviates from the flight plan. The agents found it suspicious that defendant said he would come to the door to talk to law enforcement agents but then failed to do so, and then refused to answer his hotel phone or cell phone and instead turned his television up despite being in a hotel in the middle of the night. All of this, combined with the positive alert by the certified drug dog, created a totality of facts supporting probable cause to believe that illegal drugs would be found in defendant's aircraft.

## B.  *FRANKS* ISSUE

Defendant further argues that the affidavit in support of the complaint does not establish probable cause because "information in the application for search warrant had been omitted rendering the search warrant defective. . . . The affiant failed to mention that he and five other officers had restricted defendant and unlawfully detained him for more than

14

eight hours while waiting for the issuance of the federal search warrant. He also fails to mention that when the defendant attempted to leave his hotel room, the officers chased him back into the room, detained him and searched the room."

In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court defined a limited exception to the presumptive validity of an affidavit supporting a search warrant application. Under Franks v. Delaware, if the government intentionally includes material false statements in its warrant affidavits or includes material false statements with reckless disregard for the truth that is the legal equivalent of an intentional falsehood, the court must set aside those statements and then review the remaining portions of the affidavit to see if what remains is sufficient to establish probable cause. United States v. Ozar, 50 F.3d 1440, 1443 (8th Cir.), cert. denied, 516 U.S. 871 (1995); United States v. Garcia, 785 F.2d 214, 222 (8th Cir.), cert. denied, 475 U.S. 1143 (1986). Defendant bears the burden of proving the intentional or reckless inclusion of false statements in a warrant affidavit. Id. at 222. The same analysis applies to omissions of fact, i.e., the defendant must show that the affiant intentionally or recklessly omitted material facts thereby making the affidavit misleading, and that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause. United States v. Humphreys, 982 F.2d 254, 259 n.2 (8th Cir. 1992).

15

An evidentiary hearing is not warranted unless the defendant makes a strong initial showing of "deliberate falsehood or of reckless disregard for the truth." Franks v. Delaware, 438 U.S. at 171; United States v. Freeman, 625 F.3d 1049, 1052 (8th Cir. 2010). The critical step in a Franks v. Delaware analysis is to determine whether the warrant affidavit, corrected for any false statements and omissions, is sufficient to show probable cause. United States v. Ozar, 50 F.3d at 1446.

Here, defendant states in his motion that "the search warrant signed on November 27, 2012,[1] was issued based on misleading information in the affidavit that the affiant knows or should know is false." Defendant never identifies the allegedly false information in the affidavit. In his memorandum in support of his motion, he argues only that relevant evidence was omitted. When a defendant alleges that an affidavit submitted in support of a search warrant application omitted facts, he bears the burden of making a substantial preliminary showing that "facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading," and that "the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." United States v. Reinholz, 245 F.3d 765, 774 (8th Cir. 2001); see also Franks v. Delaware, 438 U.S. at 155-156. This standard is "not lightly met." United States v. Wajda, 810 F.2d 754, 759 (8th Cir. 1987). Defendant

---

[1]The warrant was issued on November 28, 2012, not November 27, 2012 (P. Ex. 2).

16

has failed to satisfy any prong of this analysis, despite the fact that defendant had an opportunity to present evidence at a hearing.

First, defendant does not even make a suggestion that the alleged omissions were deliberate or reckless. Second, the allegations in defendant's motions are inconsistent with the evidence. Defendant was not illegally detained for eight hours, and officers did not search defendant's hotel room until after he had gathered up all of his belongings and checked out of the hotel. And finally, even if defendant's allegations were accurate and he was able to show an intent to mislead, the affidavit would not be rendered devoid of probable cause.

The critical step in a <u>Franks v. Delaware</u> analysis is to determine whether the warrant affidavit, corrected for any omissions, is sufficient to show probable cause. <u>United States v. Ozar</u>, 50 F.3d at 1446. In this case, the omissions about which defendant complains, if inserted in this seven-page affidavit, do not destroy probable cause to believe that illegal drugs would be found in defendant's airplane.

## V. PROFILE

Defendant also argued that the search warrant was not supported by probable cause because defendant was "profiled" due to the fact that he had prior criminal convictions and because he "appeared to be involved in a medical marijuana distribution in northern California, a legitimate and lawful business in the State of California". These are not the typical elements of any

17

"profile," and the probable cause finding does not change with the inclusion or exclusion of either of these facts. Not surprisingly, defendant was not able to come up with any legal authority to support his argument that a search warrant affidavit containing the type of detail listed above, including a positive alert by a certified drug dog, is devoid of probable cause if a person comes from a state where marijuana is legal or the person has prior criminal convictions. I have searched and have found none myself. That argument is completely without merit.

## VI.  CONCLUSION

Based on all of the above, I find that the affidavit in support of the search warrant established probable cause to believe that illegal drugs would be found in defendant's aircraft. I further find that defendant has failed to satisfy his burden of establishing that had the omitted information (i.e., what happened the following morning at the Argosy) been included, the original affidavit would be misleading and the amended affidavit would not establish probable cause.

For all of these reasons, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has 14 days from the date of this report and recommendation to file and serve specific objections.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 7, 2014